[Crim. No. 2800. First Dist., Div. Two. Dec. 16, 1952.]

THE PEOPLE, Respondent, v. EMERY LEE DOWNS, Appellant.

Nathan C. Coghlan for Appellant.

Edmund G. Brown, Attorney General, David K. Lener, Deputy Attorney General, N. J. Menard, District Attorney (Santa Clara), L. P. Bergna, Assistant District Attorney, for Respondent.

DOOLING, J.—The defendant was convicted of burglary and robbery. He appeals from the judgment of conviction and from an order denying his motion for new trial.

On June 3, 1948, shortly before midnight two men entered a building of the Pacific Telephone and Telegraph Company in San Jose. While these men were engaged in taking money from a safe two janitors employed by the company entered the room and were compelled by the burglars to lie down on the floor where they were securely bound. The two burglars then took from the safe $3,500 belonging to the company.

One of the janitors was unable to identify the burglars because, except for such light as came from the street through closed venetian blinds, the room was in darkness. The other janitor's testimony given at the preliminary hearing was read to the jury because of his death before the trial. This witness testified that ''to the best of my knowledge'' the defendant (Downs) is one of the men who was in the room, that he heard Downs talk that night, remembers his voice and the voices ''were the same, the best I can tell.''

Several witnesses testified to seeing a tan convertible automobile with a light top parked in front of the burglarized building; one saw a man leave the building with a wastebasket under his arm and enter this car which then drove away; another saw a man's leg going in the door while the car was driving away. The operator of a motel near San Jose testified that on June 1, 1948, appellant stayed one night at her motel and that he was driving a tan convertible automobile. Appellant and his sister testified that appellant's convertible automobile had a black top and the dealer who sold the car to appellant testified: ''I believe the top was black.'' In answer to a leading question he said that at the previous trial he had testified that the top was black.

Upon the basis of the qualified identification by the janitor, the disagreement between the prosecution witnesses' testimony as to the light color of the top of the car seen leaving the building and that of the defense witnesses that the top of appellant's car was black, and a discrepancy between appellant's height and the height of the man seen leaving the building as given by a prosecution witness, it is argued, that there was not sufficient evidence to identify appellant as one of the participants in the crime. ■ ''The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if any there were, and the

uncertainties of the witnesses in giving their testimony were matters solely for the observation and consideration of the jurors in the first instance, and for the consideration of the trial court on motion for new trial." (*People* v. *Waller*, 14 Cal.2d 693, 700 [96 P.2d 344].)

In weighing the evidence of identification, both direct and circumstantial, the jury was entitled to give its due weight to the testimony of witnesses, about to be discussed, from which it might reasonably find that at a previous trial in which the jury had disagreed appellant produced manufactured evidence in an effort to prove an alibi.

A police officer testified that at the previous trial appellant had given testimony that on the night of the burglary appellant was in Portland, Oregon. A private detective testified that he was working for a detective agency about the time of the first trial, that he was sent to Portland to determine if a Charles Murphy (an alias used by appellant) was registered in any hotel in that city on June 3, 1948, that at the Senator Hotel in Portland he found a registration card of that date with the signature Charles Murphy, that the hotel proprietor refused to allow him to take the card, but that he was called as a witness for the defense and testified at the first trial to finding this registration card in the Senator Hotel. A desk clerk from the Senator Hotel testified that he was persuaded by some person at a time long after the date it bore to insert this particular registration card in the records of the hotel. The proprietor of the hotel and the man who printed the cards testified that the particular card was of a type not used in the hotel on June 3, 1948, but only purchased for and used in that hotel at a later date. A handwriting expert testified that the signature "Charles Murphy" on this card was identical with exemplars written by appellant.

■ It was not necessary to produce the transcript of the testimony of appellant and Harris at the previous trial. Any person who has heard or given testimony is competent to testify to the testimony that was there given. (*People* v. *Shortridge*, 179 Cal. 507, 509 [177 P. 458] ; *Meyer* v. *Foster*, 147 Cal. 166, 169 [81 P. 402] ; *People* v. *Curtis*, 50 Cal. 95 ; 4 Wigmore on Evidence, 3d ed., § 1330, pp. 651-652.)

■ The attempt to manufacture or suppress evidence may always be proved against a party as showing a consciousness of guilt. (8 Cal.Jur. Criminal Law, § 157, p. 42.) The

evidence while largely circumstantial was almost conclusive that appellant had fabricated evidence to prove an alibi at the first trial.

Appellant was apprehended in Florida. What is described in his briefs as "an arsenal" of firearms and burglar tools was found in his possession. These were introduced over his objection. The cases appear to be in some disagreement as to whether weapons found in the possession of a defendant at the time of his arrest may be placed in evidence without any showing tending to connect them with the commission of the crime charged. See, for example, *People* v. *Richardson*, 74 Cal.App.2d 528, 540-541 [169 P.2d 44], relied on by appellant and *People* v. *Beltowski*, 71 Cal. App.2d 18, 23 [162 P.2d 59], cited by the People. We do not find it necessary to decide this interesting question which the cases seem to leave in some confusion. Appellant in his own defense, in an effort to explain his habitual use of assumed names, testified that because he was an ex-convict he had been persecuted by the police and that his use of aliases was solely to avoid this persecution. He further testified at length that after his last release from prison he had given up his criminal ways and let a completely law-abiding life. Appellant thus opened the door to any competent evidence calculated to disprove his sweeping assertion of reform. In *People* v. *Westek*, 31 Cal.2d 469 [190 P.2d 9], the defendant charged with criminal actions with certain boys "volunteered the sweeping statement that he had never, at any time or at any place, committed upon any boy any such sexual crime as was charged." (P. 480.) In rebuttal the People proved the commission of such crimes with boys not named in the information. The court held this proper, saying at page 481: "Appellant himself 'opened the door for the admission of such evidence, and he is therefore in no position to complain of its reception. . . .'"

The possession of an "arsenal" of firearms and burglar's tools at the time of his arrest tended to disprove appellant's testimony that he had abandoned his criminal ways, and while the "arsenal" was admitted on the People's case in chief, even before the adoption of section 4½, article VI of the state Constitution it was well settled that if evidence becomes properly admissible in rebuttal it is not reversible error that it was improperly admitted on the People's case in chief. (8 Cal.Jur., Criminal Law, § 302, p. 233.) In *People* v. *Yokum*, 118 Cal. 437 the court said at page 439 [50 P. 686]:

"But some special injury must be shown to justify the reversal of a case merely because evidence was received at the wrong time."

Appellant complains that much irrelevant and incompetent testimony was admitted from a police officer who accompanied appellant from Florida to California as to conversations with appellant, questions asked him and answers given by appellant. Much of this evidence was admitted without objection and as to all such evidence appellant cannot now complain. Specifically certain evidence was admitted over objection, of statements that appellant's wife had left him and that several of his former criminal associates had been killed and others were in prison. In view of the entire case we can find no prejudice in the admission of the particular evidence to which objection was made. The appellant's extensive criminal career was amply disclosed by other testimony and was no secret to the jury.

 Appellant further complains of certain instructions. The court after giving the statutory instruction on reasonable doubt (Pen. Code, § 1096) added: "Shortly, a reasonable doubt is one that is reasonable; one that is based on sound reasoning." While, standing alone, this language would not constitute an adequate instruction on reasonable doubt, we can find no prejudice in it, in view of the fact that the jury had just been given the statutory instruction.

The jury was also instructed:

"I might here properly caution you against adopting a hypercritical attitude in analyzing the facts of this case. You're not expected to act as lawyers. The theory of the law by which a case is tried before a jury is that 12 responsible citizens, who have a stake in their community and have a general understanding of the affairs of life, and a sense of practical values, should sit upon the facts of the case and decide them, using therefor under the Court's guidance in the matters of law, the common sense and sound judgment which they would use in deciding important matters arising in their own affairs."

This instruction does not run counter to *People* v. *Brannon,* 47 Cal. 96. There "(t)he jury were told that it was their duty to convict if they should 'be satisfied of the guilt of the defendant to such a moral certainty as would influence the minds of the jury in the important affairs of life.' "

The court in that case said: "The judgment of a reasonable man in the ordinary affairs of life, however important, is in-

fluenced and controlled by the preponderance of evidence.'' In the case before us the jury was properly instructed in the statutory language as to what constitutes reasonable doubt. They were further instructed: ''Each and every element of each crime charged must be proved to this extent; that is to say, beyond a reasonable doubt and to a moral certainty as I have defined those terms to you.'' The court then pointed out the difference between preponderance of evidence which is sufficient in a civil case and proof beyond a reasonable doubt which is required in criminal cases. ▇ In the face of these instructions the jurors must have understood the difference between preponderance of evidence and proof beyond a reasonable doubt and could not have understood that they might convict on a mere preponderance of evidence. The criticized instruction only asked the jurors to bring to the determination of the question of proof beyond reasonable doubt the common sense and sound judgment that they would use in deciding important matters of their own. No conscientious juror should do less than that.

▇ Complaint is also made of the following instruction: ''Now, the view is occasionally heard expressed that a conviction should not be had on circumstantial evidence. This is in direct conflict with the law, and is not supported by human experience. Circumstantial evidence may be as conclusive in its convincing force as the testimony of direct witnesses to the overt act and is frequently more reliable. Circumstances very largely control the conduct of men in the most important affairs of life and may be sufficient to justify the conviction of crime where they are such as to preclude any other reasonable theory than that of the guilt of the accused.''

This instruction followed immediately the approved instruction that such evidence ''must not only be consistent with the theory of the defendant's guilt, but inconsistent with any other reasonable hypothesis. This rule is applicable not only to the entire case, but also to each material fact attempted to be proved by the party relying on such indirect evidence.''

Under the charge as a whole the jury was correctly instructed on the use of circumstantial evidence and cannot have been misled into giving such evidence greater weight than it was entitled to be given under the law.

▇ The court instructed that: ''A defendant in a criminal action cannot be compelled to be a witness for or against himself. It is his absolute right to take the stand in his own

behalf and testify, or to refuse to be sworn and to refuse to give any testimony in such a case, and a person arrested for a criminal offense charged has a right to refuse to answer questions propounded to him by the police. The mere fact that he refuses to answer such questions or to discuss with the police any circumstances surrounding the arrest or charge is not proof of his guilt, nor does it necessarily raise any inference or presumption of his guilt.

''However, the failure, if any, of the defendant to answer such questions or to offer any explanation of his actions or attitude in relation to the charges made against him may be commented on by Counsel and the Court and given due consideration by the Jury.''

This instruction does, as pointed out by appellant, tend to confuse the right of a defendant not to testify with his conduct in the face of questions asked of and accusatory statements made to him by the police. However in view of the fact that appellant did testify at length at the trial and the settled rule that silence in the face of an accusatory question or statement may be considered by the jury ''as evidence of the acquiescence of the accused in the truth of the statement or as indicative of a consciousness of guilt'' (*People* v. *Simmons*, 28 Cal.2d 699, 712 [172 P.2d 18]) we can find no prejudice to appellant in the instruction given.

The conviction of robbery depended on the forcible taking of the money of the company from the possession of the two janitors. Appellant argues that the janitors had no such possession of the money as would support a conviction of robbery.

In *Neufield* v. *United States*, 73 App.D.C. 174 [118 F.2d 375] the court said of the possession necessary to support a robbery conviction:

''We think the word 'possession' in this statute is not used in the strict larcenous sense, as a result of which, although custody or control may be in a servant or agent, legal possession is said to be in the master. Larceny is an offense against the possession; robbery, against the person. The local robbery statute in our view uses the word 'possession' in a colloquial sense, meaning nothing more than custody or control.''

The leading case on the subject is probably *Brooks* v. *People*, 49 N.Y. 436 [10 Am.Rep. 398]. The facts in that case are stated by the court: ''Margaret Purcell was a child eleven years of age. . . . On the evening of the 7th of April, 1871, the parents left home to attend church, leaving the child

Margaret the sole occupant of the apartments . . . while the parents were absent, the defendants . . . came to the apartments, and while Williamson held a pistol to Margaret's head . . . Brooks took from a trunk . . . the property. . . . The property taken was articles of clothing etc., purchased by John Purcell for his wife.'' The court held that as against the robbers the child's custody was sufficient to support a conviction of robbery.

In *Reese* v. *State,* 91 Tex.Crim. 457 [239 S.W. 619] one Williams the night clerk and telegraph operator at a railroad station did not know the combination of the safe or put money into it. The day man had charge of the safe and money. Nevertheless it was held robbery where the defendant using force against the night clerk took money belonging to the company and the day agent from the safe. The court affirmed a conviction of robbery saying:

''From what has been said it follows that, in our judgment, the relation of Williams to the property was such as to characterize the assault upon him to obtain the property and its acquisition thereby as robbery.''

It is said in *State* v. *Adams,* 58 Kan. 365 [49 P. 81]:

''As against the robber, a servant has the same right, and rests under the same duty, to preserve and defend his possession of the property that the owner has. He is the custodian, and has a right to oppose the violence offered by the robber with violence, if necessary. . . . The principles governing civil actions for the recovery of property wrongfully taken have no application in a case of robbery.''

See, also, *People* v. *Dean,* 66 Cal.App. 602 [226 P. 943] and the cases collected in the note in 123 American Law Report commencing at page 1102 under the heading: ''Various types of servants and agents have been held to have had possession of property taken, for the purposes of the question here discussed.''

We regard it as no undue extension of the robbery statute to hold it applicable to any servant or servants left in sole occupation of the premises or particular part thereof by the employer.

The judgments and order denying a new trial are affirmed.

Nourse, P. J., and Goodell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 12, 1953. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.