A. B. McDONALD, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12464.

Criminal Court of Appeals of Oklahoma.

Sept. 4, 1957.

Rehearing Denied Sept. 18, 1957.

A. B. McDonald, Oklahoma City, plaintiff in error pro se.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

A. B. McDonald was by a jury in the court of common pleas of Oklahoma County found guilty of the offense of operating and holding himself out as a real estate broker without a license from the Oklahoma Real Estate Commission. The jury being unable to agree upon the punishment, left that to the court, who fixed the penalty at fifteen days confinement in the county jail, and to pay a fine of $250.

By 59 O.S.A.1951 § 856, it is provided that one found guilty of violating the provisions of the act (59 O.S.A. §§ 831–857), shall be guilty of a misdemeanor, and, if a person, be punished by a fine of not more than $500, or by imprisonment in the county jail for not exceeding six months, or by both such fine and imprisonment in the discretion of the court.

It is well to note at this point that from the record it appears that the defendant is not an attorney, but refused the offer of the court to appoint counsel to represent him; that he is a colored man; that he insisted on representing himself in the trial of the case, although the court did out of an abundance of precaution and in an effort to see that defendant's rights were protected, instruct the public defender of Oklahoma County to sit with, and be available for legal advice to the defendant during the course of the trial.

We would further observe that the record for appeal in the case was prepared at the expense of Oklahoma County by reason of the filing by defendant of a pauper's affidavit, and this court permitted the record to be filed with the clerk of the criminal court of appeals without cost deposit.

The charging portion of the information, (which information alleges that the offense was committed in Oklahoma County on February 16, 1956), reads:

"That is to say, the said defendant, in the county and State aforesaid, and on the day and year aforesaid, then and there being, did then and there wilfully, unlawfully and wrongfully offer to sell and hold out as a real estate broker, and did sell real estate located in Oklahoma County, Oklahoma, being lot 1, block 18, Creston Hill Addition, in Oklahoma City, without first securing a license as a real estate broker; contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State of Oklahoma."

In brief, pro se, the argument for reversal is based on the alleged violation by the State of defendant's rights under Art. II, §§ 1, 7 and part of § 20 of the Constitution of Oklahoma; and "the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States, and the Fifth Amendment to the Constitution of Oklahoma, and The Civil Rights Act."

The motion for new trial in the trial court and petition in error filed in this court raise the question of the sufficiency of the evidence to support conviction, and that is the question that we shall consider on this appeal. We have carefully read the entire record, with particular attention to the instructions of the court in view of the statutory provisions particular to this case, 59 O.S.A. §§ 831–857, and do not find where any constitutional right of the defendant, State or Federal, was violated. Defendant's brief fails to advise in what manner any particular constitutional right was violated.

Getting to the issue raised by the record, the sole question for the jury to determine, as indicated, was whether or not on February 16, 1956 the defendant, A. B. McDonald, had held himself out as a real estate broker without a license from the Oklahoma Real Estate Commission.

The State in making out its case called as a witness Floyd Harris, 1905 Washington Boulevard, Oklahoma City. He said that in February, 1956 he had only recently moved to Oklahoma City and was interested in purchasing a home. He was temporarily living with his brother-in-law, Alvin Roberts, and Roberts introduced the defendant to him, and defendant escorted witness around, showing him houses. He said all were too expensive except one, and he told the de-

fendant he would like to think it over and give him an answer later. Said witness: "Well he [defendant] said that any house that we would look at we could get possession within thirty days; and he had been selling real estate prior to the date that I was going to purchase this particular house." The house witness agreed to purchase was located at 2324 N.E. 20th, in Oklahoma City. He said that when the defendant showed him the house it was occupied by an elderly couple; that after he and his wife had thought over the deal, McDonald, two days later, took them back to see the house. He told witness he would have to have $150 "honest" money to hold the deal, so witness went to the bank and got $150 in cash from his savings account. McDonald did not have an official receipt, so the sister-in-law of witness wrote up a receipt that defendant signed. The receipt was received in evidence, and reads:

"February 16, 1956
"This is to certify that Floyd Harris payed [sic] the sum of $150.00 to A. B. McDonald for down payment on Lot 1, Block 18, Crestonhill Addition.
[Signed] A. B. McDonald."

Witness said that defendant at the time of the payment presented a purchase contract for the signature of witness, whereby witness was to pay a total of $9,500 for the house in question. Defendant did not leave witness a copy of the contract because he said that the people who owned the property had not yet signed the contract. Witness said that he went to see McDonald the next day to get a copy of the contract, and was told that the owner of the property would come in on the week-end, and would sign the contract then.

The evidence was that witness never did get a copy of the contract, and that the owners of the property had gotten in a squabble and would not convey the property, and witness demanded his money back from McDonald, but defendant wanted witness to accept a promissory note instead, which witness would not accept. Witness said that up to the date of the trial McDonald had never

refunded his down payment. For such reason, witness said that he consulted a lawyer, who told him to go to the Real Estate Commission for relief, and he reported the matter to Mr. Frizzell, who was its secretary. Witness later took the matter up with the County Attorney and the within prosecution was instituted.

Alvin Roberts testified that he and Floyd Harris, the prosecuting witness, were brothers-in-law, and that Harris was living with him on February 14, 1956 and that he and Harris went with McDonald to look at some property. He further testified that he was present the day Harris paid McDonald the $150 down payment on the property, and that he saw the contract for the purchase of the property, and signed it as a witness. He further stated that he heard McDonald tell Harris that the lady who owned the property lived in Tulsa, but would be down over the week-end and he would get her to sign the contract.

Joseph T. Frizzell testified that he was secretary-treasurer of the Oklahoma Real Estate Commission, and had been so employed since October 1, 1947, and that he was custodian of the records relative to licensing of real estate salesmen and brokers. He stated that the defendant McDonald did not then, and did not on February 16, 1956, have a license as a real estate salesman or broker.

The defendant cross-examined each of State's witnesses at length, and the court, no doubt by reason of the fact that defendant was not an attorney was very liberal with him in this regard, and permitted many questions that were not pertinent to the testimony of witnesses given on direct examination. In fact, extraneous matters were interjected that could have no bearing on the question of whether on February 16, 1956 the defendant possessed the license in question.

This concluded the evidence on the part of the State, and defendant interposed a demurrer, which he was permitted to argue at length in absence of the jury. The demurrer was overruled and exceptions noted.

The defendant did not testify. However, he offered the testimony of some twenty-one witnesses in the nature of character witnesses. Some testified that defendant had a good reputation in the community in which he lived, for honesty, integrity and fair dealings. Others testified that they had never heard defendant's reputation discussed, and had no idea how defendant was regarded in the community. Some were permitted, however, to give their personal opinions as to defendant's character, and stated it to be good. This was over the objections of the County Attorney. The court should not have permitted witnesses to give their personal opinions as to defendant's character. A character witness is required to base his testimony on general reputation. Hosier v. United States, 5 Cir., 64 F.2d 657; supported in principle, see State v. Thomas, 8 Wash.2d 573, 113 P.2d 73.

A. E. Pearson, attorney, testified for the defendant. He said that McDonald was licensed under the law as a real estate man for several years; that McDonald presented a $1,000 surety bond, but the bonding company cancelled out the bond, and that this was done relative to four or five bonds which defendant had offered, and then McDonald tried a personal bond, and this was refused. Witness advised defendant to bring a mandamus suit to force acceptance of a good personal bond. The suit was lost in the lower court, but won in the Supreme Court, and that another lawyer handled the matter. Witness had no knowledge of the procedures between McDonald and the Real Estate Board following the Supreme Court ruling.

Abram Ross, radio news reporter, testified that so far as he knew, McDonald's reputation for honesty, integrity and fair dealing in his community was good. On cross examination he answered that he did not know that in 1927 defendant was convicted of a felony. Defendant interposed an explanation and said, "I just hit a fellow over the head with a six-shooter." The trial court overruled an objection to this answer, and a further statement by defendant accusing the assistant county attorney of having been caught drunk in a beer tavern. The statement was clearly incompetent. Witness was further asked if he took into consideration in giving his testimony the fact that in 1951 in Oklahoma City the defendant was convicted of being drunk and driving while under the influence of intoxicants. Witness still thought defendant's reputation for honesty and fair dealing in his community good.

Defendant attempted to show a feud with the real estate board; that he had done campaigning for the county attorney in east Oklahoma City but that the county attorney had fallen out with him, and brought up by his questions other extraneous matters.

Charley Scales, attorney, testified for defendant. He was asked by McDonald:

"Q. You do not know that I had a case in the district court and you lost it before this jury and I appealed it to the Supreme Court of the State of Oklahoma and won it, A. B. McDonald versus the real estate, you remember that? A. You mean on the mandamus action.

"Q. Yes. A. Yes, I filed a mandamus action for you.

"Q. In the district court, but I won it in the Supreme Court myself. A. You won it in your name, Mac."

On cross-examination the County Attorney developed the following:

"Q. Mr. Scales, was that the action that was predicated upon the sufficiency of a personal bond? A. That's right.

"Q. That was really the issue? A. The issue was whether or not they were required to take a personal bond, if good.

"Q. The action of the Supreme Court was to declare that a good personal bond would be sufficient? A. It would be sufficient, if it was a good bond.

"Q. It would follow, then, would it not, that he must then offer the Oklahoma Real Estate Commission a good

personal bond before he would be eligible to have a license? A. That's right.

"Q. You don't know whether he ever tendered such a bond after that Supreme Court decision, do you? A. No, I do not.

"Q. Mr. Scales, as a lawyer, you know, do you not, that real estate licenses go from year to year; that each year a real estate license must be renewed like automobile licenses? A. That's right.

"Q. And even if he had succeeded in obtaining a license in 1953, it would have to be renewed in 1954, would it not? A. That is my understanding.

"Q. If he failed so to do, he would not have a license? A. That is my understanding."

Defendant sought by Judge Van Meter and others to show "that there is a fight, what you call a fight, between the County Attorney's office and myself." Defendant developed that he had been assaulted by another negro and beaten up and had filed charges, but that the County Attorney's office had not brought the case to trial and from all indications would do nothing. He testified about having a picture of his bruised face made to be used in evidence. Also he sought by the sheriff and others to show that by reason of his previous convictions he had not been permitted to visit prisoners in the county jail for the purpose of aiding in making bonds for them.

█ Apparently the issues arising from the crime charged were lost sight of, and defendant had a field-day in the examination of his defense witnesses, many of whom were apparently hostile witnesses, and if defendant had shown surprise and had kept the examination relevant, would have entitled him to ask leading questions. Melton v. State, 57 Okl.Cr. 57, 47 P.2d 195; Gullatt v. State, 80 Okl.Cr. 208, 226, 158 P.2d 353; Morris v. State, 35 Okl.Cr. 5, 247 P. 418; People v. Flores, 37 Cal.App.2d 282, 99 P.2d 326. But no such showing was made as to surprise or relevancy.

On rebuttal the State. recalled Joseph T. Frizzell, secretary-treasurer of the Oklahoma Real Estate Commission. He testified on direct examination as follows:

"Q. Mr. Frizzell, certain testimony has been introduced on both sides tending to show that some time back in 1953 Mr. McDonald was a licensed real estate salesman; that on more than one occasion his surety bondsmen resigned from his bond and that ultimately Mr. McDonald sought to have the Board to approve a personal bond and that was refused; that there was some litigation concerning that issue as to whether or not a personal bond, if a proper one, would be acceptable as one of the requirements for the issuance of a license as a real estate salesman; that the matter was carried to the Supreme Court and was resolved in Mr. McDonald's favor; that it was ruled that a personal bond, if sufficient, would satisfy the statutory requirements as to a bond for a real estate salesman. Is that correct? A. That is right.

"Q. Mr. Frizzell, what is the purpose of the statutory requirements concerning a bond for a real estate salesman? A. For the purpose of our conversation here, let's say a real estate salesman and a real estate broker is the same.

"Mr. McDonald: Just a minute, Mr. Frizzell. I object to that; that is no part of this case. The county attorney knows that ain't any part of this case.

"The Court: We had some testimony in regard to that, that has already been introduced in the case.

"Mr. Freeman: Mr. McDonald himself proved that he had litigation concerning a bond, over our objection, and now we seek to delve into that matter.

"The Court: Overruled and allow exceptions.

"A. I mentioned, for the purpose of our conversation here, let's assume, when we say real estate broker or real

estate salesman, they are one and the same, that we are meaning one and the same.

"Mr. McDonald: I object to that—he assumes; he can't testify an assumption. The court is going to ask the jury to assume.

"The Court: Answer the question if you understand it. A. The purpose of the bond is to protect the public.

"Q. In what way, Mr. Frizzell? A. Against any losses in the activities of a real estate salesman or real estate broker.

"Q. To make him financially responsible to the public with whom he deals by virtue of his authority from the real estate Commission. Is that substantially correct? A. Yes.

"Q. Now, I believe it has been agreed by the parties that the result of the ruling of the Supreme Court was that he was entitled to submit a sufficient personal bond in the proper amount as one of the prerequisites of a license. Is that correct? A. That is correct.

"Q. That happened in 1953, and the Court so ordered under a writ of mandamus, did it not? A. That is right.

"Q. I will ask you, after the Supreme Court so decided, did Mr. McDonald at any time thereafter tender to the Oklahoma Real Estate Board or Commission a personal bond of any kind? A. He did not.

"Q. Therefore, even though the decision was in his favor he did not comply then with the requirements the court had made in so far as petitioning your Commission for a license? Is that correct? A. That is correct.

"Q. That was in 1953? A. 1953 or 1954, I don't know, but since the decision.

"Q. Mr. Frizzell, is a license once given, good forever? A. No. All licenses and all bonds expire December 31st of the year in which they are written.

"Q. I take it that would mean, then, that any and every licensed real estate salesman and broker within the State of Oklahoma would have to renew his license at the beginning of each year; not just Mr. McDonald, but any salesman. Is that correct? A. That's right.

"Q. How is that done? A. It is required by law, but we furnish renewal blanks and the bonds are available from the bonding companies. In 1955 we connected the bond and the renewal together, so now whenever a broker or salesman renews their bond they automatically have their renewal attached and they file the renewal and the bond at the same time and pay their fee.

"Q. Then if a licensed salesman, who is licensed on the 31st day of December does not comply with the statutory requirements relative to the obtaining of a new license, furnishing a new bond and submitting a re-application blank, he no longer has a license. Is that correct? A. That is correct.

"Q. It is just as though he never had a license from there on? A. That is right.

"Q. Did Mr. McDonald, the defendant in this case, in 1954 or in 1955 or in 1956, or at any time up until this day ever submit to the Oklahoma State Real Estate Commission, within the meaning of the Supreme Court mandamus action, a re-application blank of any kind or any kind of a personal bond? A. He did not.

"Q. Has he made any attempt whatsoever to obtain a new license? A. He has been by the office on numerous occasions but he has never complied with the requisites that he knows he must make and that is, furnish the bond and pay the fee and the application.

"Q. When he has come by your office, have you talked with him personally? A. Yes, sir.

"Q. Has there been any personal hard-feelings between you and Mr. McDonald? A. Never at any time.

"Q. An atmosphere of cordiality was present at all times? A. With a smile on his face about as broad as it is right now about three-fourths of the time.

"Q. Has he ever asked you what to do to abide by the law and obtain a new license? A. Most of the time he said, 'When am I going to get my license?' 'When are you guys going to give me a license?' And kid it off, and that is the way he goes out.

"Q. Have you ever told him seriously what he must do to abide by the statutory requirements? A. He had a license for three years in a row, and he knows what he needs to do because he complied with the law before. I didn't see where it was necessary for me to explain to him what he needed to do.

"Q. But you have had conversations with him relative to fulfilling the statutory requirements? A. I would say ten or fifteen times.

"Q. Within the last two or three years? A. That is right.

"Q. And you say, at no time has he made any formal application and furnished a bond? A. Not since the Supreme Court decision.

"Q. In the last two or three years? A. That is right."

 No complaint has been registered as to the instructions given by the court, but we have carefully examined the same, and find them proper for the guidance of the jury as to the weight and consideration to be given evidence of good character and reputation. The court also gave instructions covering the engaging in or carrying on the business of a real estate broker or real estate salesman without first having obtained a license, as defined by 59 O.S.A. §§ 831–857. It is noted that no exceptions were taken to any of the instructions given, nor was a request made for additional instructions.

■ There was ample evidence to support the charge. In fact, there was nothing in contradiction. The court in view of the punishment authorized (59 O.S.A. § 856) was most lenient.

■ As we have, so often said, in considering the sufficiency of the evidence, which was the only real point of contention presented, the function of this court is limited to ascertaining whether there is basis in the evidence on which the jury can reasonably conclude that the accused is guilty as charged. Williams v. State, 97 Okl.Cr. 229, 263 P.2d 527; Lane v. State, 91 Okl. Cr. 107, 216 P.2d 353; Ray v. State, 96 Okl.Cr. 89, 249 P.2d 135; Anson v. State, Okl.Cr., 269 P.2d 383; Hayes v. State, Okl. Cr., 292 P.2d 442.

We have set out sufficient of the evidence to support the verdict.

The judgment appealed from is affirmed.

NIX, J., concurs.

BRETT, P. J., not participating.